Of course, under our West Virginia cases a strict compliance with the statutory requirement is exacted before a valid attachment may issue, this Court having so stated inDelaplain v. Armstrong, 21 W. Va. 211, the attachment there being based upon fraudulent conduct was not sustained by the factual statement contained in the affidavit, and DeLung v.Baer, 118 W. Va. 147, 189 S.E. 94, which was a divorce proceeding not included in the attachment statute. I am also aware of Judge Brannon's rather labored discussion in Miller etal. v. Zeigler, 44 W. Va. 484, 29 S.E. 981, 982, 67 Am. St. Rep. 777, a proceeding based upon attachment, the order of which when levied, the clerk had not signed. Yet this Court sustained the attachment and levy under a statute said to be in derogation of the common law, and hence strictly construed. (As to the origin of the law of attachment, see 4 Am. Jur. 563.) In the Zeigler opinion, Judge Brannon, in speaking for the *Page 111 
Court of the attachment statute, said: "Why technicality should override justice, in even attachment cases, I cannot understand."
I believe that the majority of the Court have not sufficiently differentiated between the legal meaning of the words "residence" and "domicile", and the extent to which intention enters into fixing of the distinct statuses indicated. There are what I regard as well considered cases holding that intention is not an element in the determination of residence, but that it depends only upon the physical location of the person, and the plain weight of authority is to the effect that while intention may be considered as a guiding factor when the circumstances are not decisive, it is certainly not controlling. Residence and domicile may differ, domicile being subject to a number of rules that do not enter into the determination of residence, such, for example, as that governing the domicile of married women. Subject to those rules, intention is necessary in the fixing of a person's domicile, and in its absence, there can be no change. Not so as to residence.
The terms under consideration are used with different meanings, dependent upon the subject matter, and it is my belief that it was the purpose of the Legislature, influenced, perhaps, by the great percentage of "foreign" capital used in the development of this state, in providing for attachment against non-residents, to give West Virginians a method of proceeding against persons with property in this state who were not regularly subject to the personal service or substituted service of process. Andrews v. Mundy, 36 W. Va. 22, 29,14 S.E. 414. I believe the Legislature itself emphasizes this fact by making the property of the person, even though he may be a resident, who is concealing himself for the purpose of avoiding the service of process, without more, subject to attachment. Code, 38-7-2. This being so, the correct interpretation of our attachment statute would seem to require that our statutes prescribing the method in which process may be served should be examined, and it is then seen that in the absence of personal service, substituted service may be resorted to at the defendant's "usual place of *Page 112 
abode." Code, 56-2-1. Considering the two statutes together would result in considering whether or not a person had a usual plate of abode in West Virginia for the service of process, in reaching a determination whether the same person was a resident or non-resident of this state under the attachment statute. Certainly, it is the general purpose of the law to prevent the evasion of process, and to devise an effective method by which the individual, or his property, may be located for the purpose of service. I believe that in applying that principle to the facts in this case, Mrs. LeFevre was plainly shown to have been a non-resident.
The majority opinion states that she left the Lemen home in 1936, stored her furniture and spent her time with relatives in Pennsylvania and Maryland; that she was living in Hagerstown, Maryland; and that the sheriff of Berkeley County was unable to obtain personal service until she appeared at his office voluntarily, driving a Maryland automobile. She did vote in Berkeley County, it not appearing that her right to do so was challenged, and often visited that county, but as far as her declared intention to establish a place of residence in this state is concerned, I am under the impression that the question here is whether an established residence was abandoned, and I do not see quite how the animus revertendi would permit the retention of a residence, not domicile, in West Virginia by a person who had given up her residence here by living in Hagerstown, Maryland. Of course, if Mrs. LeFevre had maintained rooms at Bunker Hill, particularly if they could be said to have been her usual place of abode, it might be that she could be treated as a resident of this state in spite of the fact that she also maintained an establishment at Hagerstown, Maryland. But we are not confronted with those circumstances in order to decide whether under the showing in this case she was, as a matter of law, a non-resident, it being shown that she did not maintain anything approaching an establishment in this state at the time.
For the foregoing reasons, I respectfully dissent. Judge Fox authorizes me to announce his concurrence herein. *Page 113